May it please the Court. The issue here before the Court today is satisfaction of due process under the Stream of Commerce Theory of Personal Jurisdiction and is controlled by this Court's precedent. Delaware can exercise personal jurisdiction over Suunto Oy because of its direct contacts with Delaware. Initially, Suunto Oy built a U.S. distribution network expecting that its products reach Delaware. Through that distribution network, Suunto Oy shipped products from Finland to Delaware retailers. I guess the other side would say that it was really ASWO that's handling all the sales, all the marketing, all the attempts to commercialize Suunto's products in the United States. Suunto just left that up to ASWO. What's wrong with that characterization? It doesn't erase the fact that Suunto Oy in Finland receives orders from its U.S. distributor, places the infringing products in boxes, puts labels on the boxes, and has FedEx deliver it to Delaware retailers. That's a direct action from Finland to Delaware, shipping products to Delaware. Yes, ASWO, the U.S. distributor, has a large part, which is expected in a U.S. distributor. It also helps with the website, but there's undoubtedly that Suunto owns its website and holds itself out to the world as having Delaware retailers and ships infringing products from Finland to Delaware. Some of the issues with respect to title passing. When you say Suunto ships it to Delaware, can you break that down a little bit more for me? What happens? Suunto is sitting there in Finland and then it gets contacted by, what do we call it, ASWO? Yes, your honor. All right, ASWO. ASWO notifies Suunto in Finland that somebody in Delaware, needs a shipment of these products, and then gives Suunto the address of the retailer, and then what happens? You're correct in that the order is received in Finland from ASWO. The address is given to Finland to where to ship it. The process, their standard ordering process is elicited in testimony during jurisdictional discovery. Received in Finland, Suunto OY takes product, in this case the infringing product or alleged infringing product, puts it in boxes, gets the Delaware address, makes a label, puts it on the box, and then has, for example, FedEx or some other carrier deliver it to the Delaware retailer. And who's paying FedEx right there, then and there? As the discovery indicated that the ASWO pays for the delivery, but it does not negate the actual physical act of Finland, Suunto Finland, shipping products to Delaware, nor does it negate the fact that Suunto advertises itself to the world as having Delaware retailers. In addition to those contacts, through its terms and conditions on the website, Suunto OY has ongoing data privacy obligations to customers. Those data privacy obligations arise through customers purchasing products on the website, and I refer the court to Joint Appendix 134, where it clearly identifies the controller of your, the user of the website, personal data and contact information is Suunto in Finland. So Suunto has ongoing data privacy obligations to the customer information, for example, financial information, credit cards. There would be no issue that if there was a data breach, by virtue of that obligation, they would be liable. So they have ongoing data privacy obligations to Delaware customers. And lastly, there's the issue of warranties provided by Suunto OY. The ASWO U.S. retailer or distributor is responsible under the distribution agreement for maintenance and technical support to customers in the United States. But through the actual warranty obligation, not implementation, and the testimony below clarified that it was the repair and replacement logistics that the local distributor undertook to perform. On that record of the agreement, the shipping of product to Delaware, the data privacy obligations, and the ongoing warranty obligations, Suunto OY satisfies all articulated standards of the Supreme Court's as well as this Court's stream of commerce jurisprudence. Getting back to the warranty, it sounded like it's ASWO that handles repair and replacement. That's correct. So then when you say that Suunto has a relationship with all U.S. customers, including Delaware customers, through a warranty obligation, as a functional matter, I don't see a connection that Suunto really has in serving some theoretical warranty obligation. What is the tangible contact or relationship that Suunto really has under what you're calling a warranty obligation if it's ASWO that really is doing and responsible for all the repair and replacement? There are two items, Your Honor. Firstly, the actual separating the obligation to satisfy customers' demands rests on Suunto in Finland. The implementation of that obligation is, as Your Honor has recognized, through the local distributor and by providing the technical details that it's contracted with Suunto OY to provide. So separating the logistics and the legal obligation into two separate areas. You're right. The logistics are within the U.S. distributor as provided by the distribution contract, and the legal obligation rests with the parent. That was clarified by the testimony of witnesses below where they identified performing the repair services and replacement services that you identified properly with the U.S. distributor. Another issue is that as the case is presented to the court here, it's incumbent upon Polar to provide a prima facie showing of personal jurisdiction. Under that standard, any factual disputes such as, for example, warranty would be resolved in favor of Polar. So it's Polar's position that on this record, as I said, all articulated standards of the Supreme Court's jurisprudence, including the additional or something more conduct, as we just discussed, there is no question that the products here do not simply fortuitously reach Delaware through some stream of commerce ebbs and flows. They all directly result from Suunto OY intentionally utilizing its distribution network to service U.S. and Delaware in particular. Mr. Moran, there are a lot of cases relevant here. One of them is McIntyre. We held, I guess, it is in AFTG that McIntyre didn't change the law. But what about Asahi? That was a Supreme Court decision. The issues there, Asahi did not change the jurisprudence of stream of commerce. So, I mean, it's still, nobody has yet established a choice between O'Connor, something more, or Brennan simply putting the product in the stream of commerce. It's not, this court does not need to make a choice in this particular case because there is well more than something more of shipping, data privacy, warranty. But wasn't that what Beverly Hills said? They didn't need to make a choice either. Yes, Your Honor. And that's our position that we would respect for request because the-  No, this court does not need to, on this record, a choice does not need to be made because of the additional conduct of shipping product, having the data privacy obligations, holding itself out to the world as having Delaware retailers. And I point just to illustrate that is that the, to JA 108 is a screenshot of their website identifying Delaware retailers and retailers to whom they ship from Finland. And we would request that the court on this record reverse the district court's dismissal of the case based on a lack of personal jurisdiction. How many retailers are there? It says, looks like there's- I know, Your Honor, I'm out of my time for here, but I'm glad to answer your questions if you want me to. Yeah. Yeah. I mean, I thought there were three, but now in here, it looks like there's more than three. At the time of this web shot was 22412 and 2345. There were five, five, okay, Delaware retailers. I know you're into your rebuttal, but could you say something a little bit about the Delaware long arm statute and what we're supposed to do? There's a statute and yet there appears to be, there are a collection of Delaware court decisions that seem to put a gloss on that statute with this dual jurisdiction theory. Quickly, Your Honor, the Delaware cases, there are Delaware state law cases and there are some district court cases. There is a uniform or what we'll call it the weight of authority, all applies the basic Boone case, which looks at dual jurisdiction and then requires that there is we've outlined this morning and in our brief and that the accused products, uh, give rise to why could the courts create what I will call a fifth subsection to the long arm statute. There were four subsections on, on ways to establish jurisdiction. And now there's, the courts appear to have created essentially a fifth one and we're all calling it a dual jurisdiction theory. Well, we are today and the Delaware courts, state courts the same, but the, the policy behind the dual jurisdiction was expressed in the Boone decision in Delaware is to address commerce as it existed in, uh, in today's world. Uh, and that they grappled with the issue of how do you fit today's commerce into the four sections and develop the dual jurisdiction theory, uh, which is a district court. In this case, uh, mentioned has been before, has been before, or the Supreme Court of Delaware has had multiple opportunities to say it, uh, to rebuke it. It has not. And this court in its, uh, was a commission area, the energy of Tom and Ike looked at the same statute at that time had two questions of whether it went to full Senate of the due process and whether intent required. This court need not address either of those questions because the facts of this case definitely illustrate intent to serve. And as well as all articulated standards of the, uh, Supreme Court's jurisprudence of due process under the stream of commerce. Does that answer your question? We'll save rebuttal time, Mr. Davis. Thank you. Okay. Mr. Key. Good morning. The record in this case does not support the exercise of jurisdiction over Sunto Kauai. The record in this case is extensive. HOLAR takes great liberties with the record in this case as the district court noted that polar repeatedly attempted to obscure the facts between what Sunto Kauai did and what Oswald did. There is nothing in the record that States that under the distribution agreement, Sunto is required to ship products to the U S that is what I would call a polar fiction. The record is very clear. Even the citations to the record, the distribution agreement has provision where Sunto is going to provide outbound logistics. And when you look at that provision, it does look like it reflects what the discovery, um, reflected, which is they've got to put all of it together. They're the ones that are responsible for getting the shipping love labels on the boxes. And, and they know Sunto, I guess, you, you know, where these products are going into the United States, you have the destination address, you know, it's going to the detail, to the retailer and, you know, Newark or Dover, Delaware. The distribution agreement does provide that if Oswald wants, Oswald can use the Sunto outbound logistics, but the record does not support that in this case. What the record testimony of this case from Mark Taylor, who's the president of Oswald indicated is that Oswald specifically arranged for all shipping to destinations only Oswald chose, that Oswald took title in Finland after title passed to an intermediary armor company. And Oswald had those products shipped itself into the U.S. You're not saying Oswald went into Sunto's factory and collected up the product and then physically, you know, put the product into boxes and then put the shipping labels onto the boxes and then took them out of Sunto's factory and through FedEx mailed them to Delaware. You're not saying that. No, your honor. Sunto delivers them. Sunto is doing everything, all is doing all of that, except for the fact that it's being informed by Oswald as to what the destination address should be written into the shipping label. Right? Sunto. Am I right or am I wrong? Yes, you are right that Sunto packages the products. Correct. Oswald determines where they are going. Oswald takes the risk of title. Oswald pays for the shipping and only Oswald determines where those products are going to go. In this case, some of the products went by Oswald to Delaware. There are only two retail stores in Delaware that sell the accused products. There are 12 accused products here. There may be five retail outlets, but only two, according to the record, have these sales. Of those two, we're talking about less than, on average, one watch a month per store. That is not substantial sales. Judge Sleet didn't mention the Beverly Hills fan decision at all. What are we to make of that? When you look at the facts of Beverly Hills fan, which we're bound by, as we reiterated in AFTG, the facts there look pretty similar to the facts here. There were only 52 fans in Virginia. That was known on the record. That was deemed to be enough. Here, we have double that. I would assert, Your Honor, that Beverly Hills fan is far different for a couple of key reasons. Beverly Hills fan, the complaint specifically alleged that the foreign company was selling and shipping into the jurisdiction. In this case, the complaint, paragraph six, has a formula, not facts. It states only that Suunto, Oswald, and First Beat have established minimum contacts. There are no facts. There's a direct shipment, is there not? There's a, or in the case in which there is a direct shipment from Finland to the retailer, title would pass in Finland, would it not? Title passes in Finland to Oswald. What is the path of remedy in that case? Is it still only the distributor that had no role in the distribution? It is only Oswald who is directing the sales in this case. In Beverly Hills fan, it was specifically found that the foreign company and the U.S. distributor worked in consort. There was a specific finding there. There is no such fact or record in this case, which makes us different from Beverly Hills fan. But what about the distribution agreement? Why doesn't the distribution agreement between Suunto and Aswo here, who are sister companies by the way, represent the creation of a distribution channel into the United States with the understanding that Suunto is going to be handling the front end of that distribution channel, i.e. the outbound logistics to get the Suunto hosts that lists the Delaware retailers where the product is available, as well as handling those outbound logistics for product it knows is going to Delaware among other places. Why isn't that enough to represent that these two companies are working as partners in consort to create this distribution channel where Suunto knows that the products are going into Delaware among other places? Because the record doesn't support it, Your Honor. What the record supports... What was in my summary that is not in the record? Aswo solely is responsible for any e-commerce sales. Suunto may have a website, but Aswo pays Suunto a fee in order to have a link to a separate e-commerce site that only Aswo operates. Only Aswo conducts sales through. But to get to that site, you've got to go through Suunto's site that Suunto hosts. Am I right? Correct. That is correct. But Suunto does not make a sale. Only Aswo does at a separate website. The dealer locator... The record is clear. The dealer locator that lists places in the U.S. for purchase is only maintained by Aswo, not by Suunto. Suunto has no knowledge of it, and the record reflects that in this case. One of the decisions in this case, this court, Selgard in 2015, indicated that jurisdiction can't be imputed from the activities of one back to another through agency without specific proof of agency, and that proof of agency is not here in this case. This case... If there is a defective product, what is the path of remedy in your position only to the distributor who had no hand in either the manufacturer or the shipment or anything else? It would be through Aswo or Polar was free to sue in Utah, where Suunto has contacts, which was established in the lower court. Just to follow up on Judge Newman's question, when there's a broken heart monitor, how does that broken product get replaced or repaired? Aswo is 100% responsible for the warranty. But how does then Aswo take care of the issue? It probably calls up you, Suunto, right? No. It does the repair or replacement itself? Correct. How would Aswo do a replacement of a Suunto product on its own without any help or assistance from Suunto? Aswo has the capability to repair, maintain, and replace broken products, and the record is clear of this. Could you explain how it would replace a new product or a defective Suunto product with one of its own products? Aswo has a cache of products. If your watch breaks, you contact Aswo, and Aswo either repairs it, you ship it to Aswo for repair, or if it can't be repaired, Aswo replaces the product. So it has some of Suunto's products in its possession in a back room somewhere? Of course. The Supreme Court in Asahi, Judge O'Connor's opinion, was that in the stream of commerce, it requires more than simply releasing a product into the stream of commerce. That's not enough. There has to be something intentional, something that purposely avails of the privileges of doing business in the state. How many justices did Justice O'Connor write? It was a plurality, Your Honor. But in this court, and the Federal Circuit, in Commissure versus Chimay, this court recognized O'Connor's test in Asahi, and had remanded for discovery to see if the O'Connor test was passed. In Delaware, under this dual jurisdiction theory, the Boone case, on which Polar relies on so much, also recognized that O'Connor's decision in Asahi was the law of Delaware, and in that case, it relied on general jurisdiction. The Boone case of dual jurisdiction was a case in which the foreign manufacturer was shipping 50,000 tons of asbestos a month over 10 years into Delaware, and they found general jurisdiction. This is a case where there's not substantial revenue. We're talking about less than one watch per store per month. So to understand, are you proposing that there is a clear line whereby whenever there is a U.S. distributor, the foreign manufacturer, supplier, shipper, source is never subject to jurisdiction? Your Honor, I'm only suggesting the facts of this case do not support jurisdiction under any of the decisions of this court or the Supreme Court. I'm not suggesting a widespread rule. I'm not expressing a change in the law. I'm simply advocating that this court follow its own precedent, follow Asahi, follow Burger King. The purposeful availment test can't be met here. Thank you. Okay, but I'm thinking that the facts of this case include direct shipments to the retailer, the receipt of orders directly from the retailer, not going through the distributor. I'm sorry, I don't understand those facts. Is that incorrect? The facts in this case are not that the retailer makes orders to Suunto or that Suunto is shipping to the retailer. So let me ask you a hypothetical. Yes. Let's just suppose that the retailer likes the product, says I'll order some more, don't bother with the distributor, and contacts Suunto directly. Would your argument then differ? In that instance, Your Honor, you would have direct contact between the foreign company and the state. That would be a very different scenario. But you're telling us that there is a direct warranty in, I suppose, the sales terms that does not amount to a direct contact, even though you tell us that Suunto would honor the warranty? The record establishes that the warranty is by Oswald, not by Suunto. Oswald issues the warranties for all sales in the U.S. and honors the warranties for all sales in the U.S. Oswald, the distributor, does. Okay, so that the sales terms, even though there's a direct shipment from Finland to the U.S. retailer, does not include a warranty of whatever might accompany a normal sales transaction? The warranty and the shipment both are by Oswald in this instance. When you say that Oswald is doing the shipping of the product to the Delaware retailer, how is that possible? When Oswald is not the one in Finland, the only people in Finland are Suunto and then FedEx when they come to pick up the product off of Suunto's dock. Because the company that brings the stuff over is doing so for Oswald. Obviously, Oswald isn't taking a flight, picking up things and bringing them back to the U.S., nor is Suunto taking a flight with things and bringing them to the U.S. There is an intermediary like FedEx whom Oswald contracts with for the shipments. And I know you are in favor of Judge Sleet's opinion to the extent that Judge Sleet found that Polar or Suunto didn't meet minimum contacts under constitutional due process. But what in your view was wrong with Judge Sleet's view on the Delaware long arm statute and finding that Suunto did meet the dual jurisdiction theory? I'm running out of time. Can I? Yeah, quickly. The problem with that finding is under this dual jurisdiction theory, the second prong of it requires a finding of general jurisdiction, not specific jurisdiction, general jurisdiction. And there's no facts to support general jurisdiction here. And Polar has not advocated general jurisdiction. So that's a failure in the finding of dual jurisdiction in this case. Thank you. Thank you, Mr. King. Mr. Moran. May it please the court, just a few points. This case is not a general jurisdiction case. It's a stream of commerce specific jurisdiction case. But just getting to your opposing counsel's point, can you explain what, if anything, is wrong in his statement that for the second part of the dual jurisdiction theory to be satisfied, you have to meet some general jurisdiction requirement? Is that right or is that wrong? There are a number of things wrong with it. One, it's not what the Boone case held. In fact, the Boone case specifically said that you have to be very careful in not placing more weight on one factor or another factor. And it went on to enunciate how to evaluate the factors under its new dual jurisdiction, as this court already recognized in this previous missionary case, that the intent is one factor, intent to serve Delaware. And then, does the case arise from the accused product being in the forum? And then, as we discussed earlier in my first part of my statement, both of those are satisfied here. The fact that general jurisdiction is mentioned, as the counsel said, is given. But as I said, the first part is it doesn't fit with Boone. And second, it's inherently contradictory. If the requirement was that somebody had to demonstrate general jurisdiction, then you wouldn't need dual jurisdiction at all because you satisfied dual jurisdiction. So inherently, it conflicts with the existence of dual jurisdiction. With that, if you have any more questions, I'd be glad to answer them. I have nothing further. What are the consequences of this case for Polar? There are two Finnish entities attempting to litigate against each other in the United States courts. Has there been injury, liability to your client that is not subject to compensation by the distributor, as we've been told? Let's assume for a moment that the case goes forward in a forum. As I understand, your question would, would our client, Polar, get full satisfaction from the distributor? Yes. It's not clear, but in damages aspect, perhaps yes. In discovery, perhaps yes. Because it's a foreign person, foreign entity is not part of the case. And there's another defendant that's not part of this appeal in the Delaware case that's part of this infringement action. And then there's the issue of a potential injunction. So that if there was injunction against the U.S. distributor, it does not prevent the foreign entity from using a different entry to the United States or direct entry. So that there is financially for past damages, perhaps, and I haven't, you know, investigated thoroughly, but satisfaction, but not in terms of equitable relief at a trial court. No, Your Honor. Okay. Your opposing counsel brought up CellGuard. Do you see this case as a stream of commerce theory case or an agency theory case? Agency is not part of our argument here, Your Honor. Okay. Okay. Okay. Thank you, Mr. Moran. Mr. Key, the case is taken under submission.